**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID STRAUSS, on behalf of himself and all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>STARBUCKS CORPORATION,<br><br>*Defendant.* | Case No. <u>7:25-cv-3809</u><br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

**PREAMBLE**

Plaintiff David Strauss ("Plaintiff" or "Strauss"), a resident of Irvington, New York, individually and on behalf of others similarly situated, by and through his counsel, hereby files this Class Action Complaint for equitable relief and damages against Defendant STARBUCKS CORPORATION ("Starbucks") and alleges the following based upon personal knowledge, information, and belief:

**INTRODUCTION**

1.      This case is about the sourcing and safety of Starbucks coffee.[1] Although Starbucks, in partnership with Conservation International, represents to the public that it applies stringent human rights and sustainability standards to the farms sourcing its coffee, those representations

---

[1] The relevant products include all Starbucks coffee products, including all decaffeinated Starbucks coffee products (the "Products"). Neither Starbucks nor Conservation International limits its sourcing representations to any particular subset of Starbucks coffee product lines. Plaintiff also reserves the right to amend to add additional challenged decaffeinated products if testing reveals similar safety concerns, as detailed *infra*, Part III.

1

mask a reality of abuse and environmental degradation on the ground. Moreover, Starbucks represents that its Decaf House Blend Medium Roast is safe, despite testing indicating that it contains chemicals known to negatively impact human health. Plaintiff brings this action on behalf of himself and the Class of persons who saw and were harmed by these representations.

2.     Coffee is one of America's most popular drinks. Americans consume vast quantities of coffee, with the large majority drinking coffee daily. 66% of American adults had coffee in the last day. This is higher than any other beverage, including water.[2]

3.     Starbucks Corporation ("Starbucks") is a multinational corporation headquartered in Washington State that owns the world's largest chain of coffeehouses, with more than 35,000 locations in 80 countries and more than 700 locations in New York State. Starbucks works with more than 450,000 farms worldwide to grow the coffee that ultimately winds up in the Products.[3] These farms supply Starbucks with coffee, which Starbucks roasts in-house at roasting plants in the United States, the Netherlands, and China.[4]

4.     Conservation International ("CI") is a nonprofit organization based in Virginia that partners with corporations and governments and purports to work to stabilize the climate by protecting and restoring nature, safeguarding oceans, and promoting nature-positive sustainable development.[5] CI asserts that it believes in corporate social responsibility and works with

---

[2] *More Americans Drink Coffee Each Day Than Any Other Beverage, Bottled Water Back in Second Place*, Nat'l Coffee Ass'n (Apr. 15, 2025), https://www.ncausa.org/Newsroom/More-Americans-Drink-Coffee-Each-Day-Than-Any-Other-Beverage-Bottled-Water-Back-in-Second-Place.

[3]     *Starbucks    Global    Impact    Report*    at    18,    Starbucks    (2023), https://about.starbucks.com/uploads/2025/02/FY2023-Starbucks-Global-Impact-Report.pdf ("2023 Global Impact Report").

[4] *Exploitation and Opacity: The Hidden Reality of Mexican Coffee in Nestle and Starbucks Supply Chains* at 32, Coffee Watch (Feb. 2025), https://coffeewatch.org/documents/23/Exploitation_and_Opacity_-_ENG_Final.pdf ("Coffee Watch Mexico Report").

[5]     *Conservation    International    Protects    Nature    Like    This*,    Conservation    International, https://www.conservation.org/home (last visited May 2, 2025).

corporations "to align the market with environmentally friendly policies and to help businesses adopt more sustainable production practices."[6]

5.     In Starbucks's marketing materials, including on its website, packaging, and public-facing reports, Starbucks makes three key representations about the Products. *First*, it asserts that the Products are sourced consistently with stringent human rights standards developed by and enforced in partnership with Conservation International, including prohibitions on forced and child labor. Starbucks claims that it has achieved between a 99% and a 99.6% success rate at ethically sourcing coffee (the "Human Rights Representations"). *Second*, Starbucks tells consumers that the Products are sourced sustainably, with concern for the climate, deforestation, biodiversity, and waste, and in pursuit of significant emissions and waste reductions goals by 2030 and net zero by 2050 (the "Sustainability Representations"). *Third*, Starbucks represents that its Decaf House Blend Medium Roast is decaffeinated using a process that is "Safe and Effective," and that the resulting coffee's only ingredient is arabica coffee (the "Safe and Effective Representations").

6.     Conservation International, both in partnership with Starbucks and in its own public facing-materials, also makes Human Rights and Sustainability Representations about Starbucks's coffee sourcing. Packages of Starbucks coffee contain a representation that Starbucks and CI are working together to achieve 100% ethical sourcing.

7.     Starbucks and CI know that consumers are invested in human rights and sustainable sourcing. Consumers are deeply troubled by issues like slavery, child labor, deforestation, and climate change. By representing to consumers that Starbucks is first-in-class on those issues and that it has nearly tackled them, to within a rounding error, Starbucks and CI are knowingly

---

[6] *Engaging with Corporations*, Conservation International, https://www.conservation.org/priorities/engaging-with-corporations (last visited May 2, 2025).

encouraging consumers to purchase more Starbucks Products than they otherwise would. Defendant's representations did indeed result in additional sales of Starbucks Products.

8.      Starbucks is also aware that consumers care deeply about their health. Consumers expect the processes used to produce their food to be safe and effective—so much so that concerns in this area can drive consumers away entirely.

9.      As discussed in detail below, all three sets of representations are false and misleading. Starbucks's coffee supply chain is shot through with serious human rights violations that appear impervious to Starbucks's and CI's claimed standards. Starbucks's coffee supply chain is not sustainable, instead causing increased carbon emissions, deforestation, and harm to local communities. And Starbucks Decaf House Blend Medium Roast is not safe and effective and instead exposes consumers to hazardous chemicals.

10.     Consumers are not able to learn the truth of Defendant's representations on their own and are forced to rely on Defendant's public-facing materials to see inside the industry. They have been and will continue to be misled by Defendant's misrepresentations.

11.     As a result of its false and misleading labeling and advertising, and omissions of fact, Starbucks, assisted by CI, was and is able to sell coffee to consumers in the State of New York and throughout the United States and to benefit financially from those sales.

12.     During any applicable statute of limitations period (the "Class Period"), Plaintiff and members of the Class (described *infra*) saw Defendant's Human Rights and Sustainability Representations, and Starbucks's Safe and Effective Representations, when purchasing Starbucks coffee and its Decaf House Blend Medium Roast. Plaintiff and members of the Class (described *infra*) paid more for these Products than they otherwise would have paid, and/or purchased the Products, or purchased more of the Products, than they would have if they had known that Defendant's Human Rights and Sustainability Representations and Starbucks's Safe and Effective

4

Representations were false. As a result, Plaintiff and Class Members were injured.

13.     Therefore, Defendant's Human Rights and Sustainability Representations, and Starbucks's Safe and Effective Representations, are false, deceptive, and misleading in violation of New York's General Business Law ("GBL") Sections 349 and 350 and other state consumer protections laws, and in breach of express and implied warranties. Defendant was, thus, unjustly enriched.

14.     Because Defendant's representations tend to mislead and are materially deceptive about the true nature and quality of the Product, Plaintiff brings this deceptive advertising case on behalf of a proposed Class of consumers who purchased the Products throughout the United States during the Class Period, and seeks relief including actual damages, interest, costs, and reasonable attorneys' fees. Even today, members of the proposed Class are purchasing the misrepresented Products, and they will continue to do so unless Defendant's conduct is stopped.

## JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act ("CAFA"). There are at least 100 members in the proposed New York plaintiff class.

16.     Plaintiff is a citizen of New York. Plaintiff consents to this Court's jurisdiction over him by filing this complaint.

17.     The Court has personal jurisdiction over Starbucks because the claims herein arise from Starbucks transacting business in New York. Starbucks operates many stores in New York, has purposefully directed its marketing practices to New York consumers, regularly conducts and transacts business in New York, distributes the Products throughout New York, and has availed itself of the benefits and protections of New York law, and it is, therefore, reasonable for Starbucks

to anticipate being subject to an action in the courts of this District.

18.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b)(2) because substantial acts in furtherance of alleged improper conduct, including the dissemination of false and misleading labeling and advertising regarding the nature and quality of the Products at issue, occurred within this District; and because Defendant directs its marketing at consumers within New York and has caused injury in New York.

## PARTIES

19.     Defendant Starbucks is a multinational chain of coffeehouses and roastery reserves headquartered in the Starbucks Center at 2401 Utah Ave S, Suite 800, in Seattle, Washington. In 2023, Starbucks was "the leading coffee shop/cafe chain in the United States," "with sales amounting to approximately 31.6 billion U.S. dollars."[7]

20.     At all times mentioned herein, Plaintiff David Strauss was and is an individual consumer older than age 18. Within the Class Period, Plaintiff purchased Starbucks coffee, including Decaf House Blend. He has been drinking decaf coffee since 2007 and would go through a bag every two-to-three weeks, often purchasing from Stop & Shop at 610 White Plains Road, Tarrytown, NY 10591, Shoprite at 320 Saw Mill River Road, Elmsford, NY 10523, and Starbucks itself.

21.     In deciding to make his purchases, like other consumers, Plaintiff saw, relied upon, and reasonably believed Starbucks's Human Rights, Sustainability, and Safe and Effective Representations.

22.     Members of the proposed class are currently purchasing and will continue to purchase the Products, unaware that the Human Rights, Sustainability, and Safe and Effective

---

[7] *Sales of Selected Leading Coffee Shop and Cafe Chains in the United States in 2023*, Statista (Apr. 2024), https://www.statista.com/statistics/919774/sales-of-selected-leading-coffee-house-and-cafe-chains-in-the-us/.

Representations are false.

## FACT ALLEGATIONS

**I.    Defendant Falsely Represents That Starbucks Coffee Products Are Sourced with Respect for Human Rights.**

23.    Both Starbucks and Conservation International make public-facing representations that the Products are sourced with respect for human rights (collectively, the "Human Rights Representations").[8] Defendant makes specific promises regarding human rights standards that Starbucks purportedly requires of its suppliers, including the avoidance of slavery, child labor, hazardous conditions, and irregular pay. Moreover, when the representations are taken together in almost any combination, they create a holistic picture that the Products are made with coffee beans sourced from operations where workers are well-treated.

24.    The Human Rights Representations are false and misleading, given the extensive evidence of abuse in Starbucks' supply chain.

25.    The Human Rights Representations are material, as consumers care significantly about human rights issues in product sourcing, will actively avoid products whose supply chains contain human rights abuses, and will pay more for ethically sourced goods.

**A.    Defendant Makes Human Rights Representations About Starbucks Coffee Products.**

26.    Starbucks extensively paints a picture of itself as both committed to and wildly successful at securing the human rights of workers on farms supplying its coffee. On the back its bags of ground coffee, for example, which it offers for individual consumer sale, Starbucks asserts that it is "Committed to 100% Ethical Coffee Sourcing in partnership with . . . Conservation International":

---

[8] This term is inclusive of all the representations identified in this Section. Plaintiff reserves the right to amend this Complaint to include additional representations if and when they are discovered.



The fronts of such bags include the similar promise "Committed to 100% Ethical Coffee Sourcing":





⁹ *Starbucks Pike Place Ground Coffee*, Staples, https://www.staples.com/starbucks-pike-place-ground-coffee-medium-roast-2-5-oz-portion-packs-18-box-sbk11018197/product_369004 (last visited May 2, 2025).

¹⁰ *Pike Place Roast,* Starbucks Coffee at Home, https://athome.starbucks.com/products/pike-place-roast-ground (last visited May 2, 2025).

¹¹ *Starbucks Mountain Blend*, Starbucks Coffee at Home, https://athome.starbucks.com/products/starbucks-

 

27.     On the "About Us" portion of its consumer-facing website, and under a photograph of bucolic green hills covered in farms, Starbucks asserts, "We Believe in the Pursuit of Doing Good. As it has been from the beginning, our purpose goes far beyond profit. We believe Starbucks can, and should, have a positive impact on the communities we serve."[14]

28.     In the "Our Mission" section of its website, Starbucks promises, "We do the right thing, even when it's hard," and, "We exceed the expectations of the people we serve." Among Starbucks's "Promises" are "Our Farmer Promise—Ensure the future of coffee for all" and "Our Community Promise—Contribute positively."[15]

29.     On the "Farmer Promise" page of its website, Starbucks claims that it has "a unique opportunity to enhance lives by promoting ethical and sustainable practices globally," done by

---

mountain-blend-ground (last visited May 2, 2025).
        [12] *Espresso Roast*, Starbucks Coffee at Home, https://athome.starbucks.com/products/espresso-roast-ground (last visited May 2, 2025).
        [13] *Starbucks Holiday Blend*, Starbucks Coffee at Home, https://athome.starbucks.com/products/holiday-blend-ground (last visited May 2, 2025).
        [14] *About Us*, Starbucks, https://www.starbucks.com/about-us/ (last visited May 2, 2025).
        [15] *Our Mission*, Starbucks, https://about.starbucks.com/mission/ (last visited May 2, 2025).

"support[ing] farmers and their families and ensur[ing] that our supply chain promotes sustainable and transparent growing practices."[16]

30.     Starbucks claims that it "centers and respects our farming communities."[17]

31.     The "Farmer Promise" page claims that Starbucks engages in "Ethical Sourcing of Coffee." Starbucks represents that it applies "ethical sourcing standards," created "in collaboration with Conservation International," through their joint C.A.F.E. [Coffee and Farmer Equity] Practices. Those C.A.F.E. Practices, Starbucks asserts, help "positively impact[ ] the lives of coffee farmers and their communities."[18]

32.     The C.A.F.E. Practices program is the "cornerstone of [Starbucks's] ethical sourcing approach."[19] The C.A.F.E. Practices program exists to "verify that all Starbucks coffee is grown, processed, and traded in an economically, socially, and environmentally responsible manner."[20]

33.     Starbucks calls the C.A.F.E. Program the "cornerstone" of its purportedly ethical sourcing—yet Starbucks keeps the lists of C.A.F.E certified farms secret and does not publish them for the public to see.[21]

34.     Starbucks tells consumers on its website that the C.A.F.E. Practices require farmers to "protect the rights of people working on their farms" and to "promote a safe, fair and humane work environment" with "zero tolerance for any child labor."[22]

---

[16] *Our Farmer Promise*, Starbucks, https://about.starbucks.com/our-farmer-promise-ensure-the-future-of-coffee-for-all/ (May 2, 2025).
[17] *Id.*
[18] *Id.*
[19] *C.A.F.E. Practices: Starbucks Approach to Ethically Sourcing Coffee*, Starbucks (Feb. 28, 2024), https://about.starbucks.com/press/2024/cafe-practices-starbucks-approach-to-ethically-sourcing-coffee/.
[20] *C.A.F.E. Practices Standard* at 1, Starbucks (Mar. 2025), https://cdn.scsglobalservices.com/files/program_documents/C.A.F.E.Practices_STD_Standard_V4.1_032625.pdf ("C.A.F.E. Standards").
[21] *Behind Starbucks Coffee* at 7, Repórter Brasil (Oct. 2023), https://reporterbrasil.org.br/wp-content/uploads/2023/11/monitor_starbucks_coffee_slave_labor_ENG.pdf ("Behind Starbucks Coffee").
[22] *C.A.F.E. Practices: Starbucks Approach to Ethically Sourcing Coffee*, *supra* note 19.

10

35.    The C.A.F.E. Practices themselves, available on Starbucks's website, consist of 144 human rights indicators that Starbucks claims are evaluated by a third-party inspector. Some indicators, addressing the most serious human rights violations, are the "minimum requirements for participation" in the program and are claimed to be subject to a "Zero Tolerance" policy.[23] Those minimum requirements include:

- that all workers are paid the legal minimum wage, a collectively-bargained-for wage, or if neither applies, a wage set in the Practices;[24]

- that no forced, bonded, indentured, convict, or trafficked labor be used;

- that physical, sexual, verbal, and psychological harassment is prohibited;[25]

- that no child labor occurs, except where light work and/or family work is permissible by law and is done in compliance with all local laws, and with minors prohibited from handling chemicals, using heavy machinery, or lifting heavy loads;[26] and

- that any worker housing is safe, includes water and sanitary facilities, and is free of harmful or irritating substances.[27]

36.    When Starbucks is notified of a Zero Tolerance violation, it promises to take "immediate action, conducting an investigation which could lead to suspending the commercial relationship with a farm until the case has been clarified." If there is a violation, Starbucks "may ask our supplier to work with a farm to address any issue including the development of a work plan describing how the issue will be corrected."[28]

37.    In a 2020 "Global Human Rights Statement" from Kevin Johnson, President and CEO of Starbucks at the time, he asserted that Starbucks's mission is to "inspire and nurture the human spirit—one person, one cup and one neighborhood at a time," and that Starbucks makes a

---

[23] *C.A.F.E. Standards, supra* note 20, at 3-4.
[24] *Id.* at 8-9.
[25] *Id.* at 10.
[26] *Id.* at 11, 13.
[27] *Id.* at 11-12.
[28] *C.A.F.E. Practices: Starbucks Approach to Ethically Sourcing Coffee*, *supra* note 19.

"commitment to have a positive impact on the lives of all the people we touch—from the fields where our coffee is grown, to the local communities we serve and the planet that we all share."[29]

38.    Starbucks promises to "respect the human rights of individuals and communities impacted by our operations and products, and we commit to respect the principles of the: UN Guiding Principles on Business and Human Rights; UN Global Compact; OECD Guidelines for Multinational Enterprises; International Bill of Rights; ILO Core Labor Standards; Women's Empowerment Principles; Children's Rights and Business Principles, and Framework Principles on Human Rights and the Environment."[30]

39.    Addressing its supply chain specifically, Starbucks promises that its "ethical sourcing programs integrate respect for human rights throughout our Supply Chain, addressing rights such as: the right to non-discrimination; the right to be free from forced and child labor; the right to association; and the right to just and favorable working conditions, including ensuring the health and safety of workers. As part of our commitment, we respect the rights of vulnerable groups, such as women, migrant, seasonal and temporary workers, as well as the rights of indigenous communities. We are also committed to pursuing sustainable livelihoods within our Supply Chain to achieve a decent standard of living."[31]

40.    Starbucks also states in its Global Human Rights Statement that all its suppliers must comply with Starbucks's Supplier Code of Conduct.[32] That Code of Conduct asserts that Starbucks "respects the human rights of individuals and communities impacted by our operations and products and extends these expectations to Suppliers throughout our global supply chain."[33] It

---

[29]    *Starbucks Global Human Rights Statement* at 1, Starbucks (2020) https://content-prod-live.cert.starbucks.com/binary/v2/asset/143-72282.pdf.
[30]    *Id.*
[31]    *Id.* at 4.
[32]    *Id.*
[33]    *Starbucks Supplier Code of Conduct* at 5, Starbucks (Dec. 2024), https://content-prod-live.cert.starbucks.com/binary/v2/asset/143-96213.pdf

claims to be informed by "international instruments" including the Universal Declaration of Human Rights.[34]

41.     The Code of Conduct specifically prohibits: (1) using forced or involuntary labor, including bonded, indentured, and imprisoned labor; (2) using child labor; (3) forcing employees to pay recruitment fees; (4) mistreating migrant workers; (5) violating workers' rights laws; (6) illegal denial of collective bargaining; (7) creating an unsafe or unhealthy working environment; (8) engaging in discrimination; and (9) violating laws regarding indigenous peoples.[35] The Code of Conduct also includes the general requirement that suppliers comply with local laws and regulations and engage in responsible sourcing practices.[36]

42.     Starbucks released a "Human Rights Impact Assessment" in December 2023. In that assessment, Starbucks reiterated that it puts "people first" and acknowledged that its global reach "comes with responsibility" including "avoiding causing, contributing or being linked to adverse human rights impacts."[37]

43.     Starbucks also released a Global Impact Report for fiscal year 2023. In that report, Starbucks asserts that "99.7%" of its coffee for fiscal year 2023 was "ethically sourced and verified through C.A.F.E. Practices."[38]

44.     Conservation International is intimately involved with Starbucks's Human Rights Representations, both supporting Starbucks' statements through its participation in their joint C.A.F.E. Practices program and by making direct representations of its own.

45.     As CI claims on its website in large type, Starbucks and Conservation International

---

[34] *Id.*
[35] *Id.* at 5-6.
[36] *Id.* at 2.
[37]     *Starbucks Human Rights Impact Assessment* at 2-3, Starbucks (Dec. 2023), https://about.starbucks.com/uploads/2023/12/Starbucks-Human-Rights-Impact-Assessment_December-2023.pdf ("Starbucks 2023 Human Rights Assessment").
[38] 2023 Global Impact Report, *supra* note 3, at 19.

"have created a new way to produce coffee: one that is sustainable, transparent, and good for people and the planet" and "are sparking an industry-wide movement to make coffee the first sustainable agricultural product in the world."[39]

46.    CI represents that it and Starbucks are "protecting the well-being of coffee farmers and workers their families and their communities through C.A.F.E. Practices." While acknowledging that there is "always more to do," CI asserts that "Starbucks is committed to 100% ethically sourced coffee, and Conservation International is a proud partner in this effort."[40]

47.    CI further invites visitors to its website to "Follow Starbucks' Journey to 100% Ethically Sourced Coffee" by viewing a video.[41] That video, produced by CI and posted to YouTube under CI's name, asserts that "together, [Starbucks & CI] have created a new way to buy their coffee, one that is sustainable, transparent, and good for people and the planet." Starbucks, as CI asserts, "ethically sourc[es] 99% of their coffee" and is "committed to 100% ethically sourced coffee." Starbucks, per CI, is engaged in a "constant pursuit of that last 1%." This "add[s] up to a world that's changed for the better."[42]

48.    In short, Defendant trumpets Starbucks's commitment to human rights in the sourcing of its Products. Both Defendant's specific statements, and the impression created by their many representations when viewed together, lead consumers to believe that Starbucks has a laser-focus on human rights issues and has eliminated the vast majority from its supply chain.

49.    Indeed, Starbucks and CI repeatedly describe Starbucks as "99%" or more of the

---

[39]    *Starbucks    +    Conservation    International*, Conservation    International, https://www.conservation.org/corporate-engagements/starbucks (last visited May 2, 2025). CI also states that "[t]hrough this campaign, Starbucks contributed to Conservation International for every bag of coffee sold at participating stores in the U.S." *Id.*

[40] *Id.*
[41] *Id.*
[42] *Follow Starbucks' 15 Year Journey to 100% Ethically Sourced Coffee | Conservation International*, YouTube (Apr. 8, 2015), https://www.youtube.com/watch?v=DaG10sqw9fk.

14

way to ethical coffee sourcing. Defendant does not just describe aspirational goals but represent to consumers that Starbucks is having an overwhelmingly positive effect on farming communities and that any negative effects are a fraction of a percent that Starbucks is actively working to correct.

**B.    Defendant's Human Rights Representations Are Misleading to Consumers.**

50.    Defendant's sunny representations and claims of a nigh-on-perfect human rights record are false and misleading and are contradicted by realities on the ground, where human rights abuses, from poor working conditions to forced labor, are distressingly common at Starbucks farms supposedly protected by Starbucks and CI's C.A.F.E. Practices program.

51.    Despite Starbucks's C.A.F.E. Practices program, there have been "numerous cases" in which a farm was certified despite labor exploitation. The certification scheme "fail[s] to deliver on their sustainability and fairness commitments."[43]

52.    Additionally, Starbucks' close collaboration with CI "raise[s] concerns about potential conflicts of interest and lack of independence in verifying C.A.F.E. Practices standards," since the Board of CI includes the former CEO of Starbucks.[44] There is also a "revolving door" between public officials who regulate activities relating to coffee production and private-sector organizations like CI.[45]

53.    Recent investigation by the Center for Research on Multinational Corporations (SOMO) found extensive human rights violations in coffee plantations in Brazil, which SOMO identified as "the failure of certification schemes." While companies "purport to ensure the ethical sourcing of coffee through industry certification and auditing schemes . . . new revelations of modern slavery on certified farms accumulate."[46]

---

[43] Coffee Watch Mexico Report, *supra* note 4, at 63.
[44] *Id.* at 71.
[45] *Id.*
[46] *Bitter Brew: Modern Slavery and the Coffee Industry* at 2-3, SOMO (Jan. 10, 2024),

54.     SOMO found that "Starbucks had direct business relationships with the farms where modern slavery was found."[47]

55.     Per the SOMO report, in July 2022, seven workers were rescued from the Fazenda Klem farm in Manhumirim, Minas Gerais, which had been certified by Starbucks's C.A.F.E. Practices.[48] The farm had failed to register its workers, "a key indicator of modern slavery." The workers were forced to harvest coffee in bare feet and socks without protective footwear or safety equipment. They were given no shelter for meals during the workday. Their accommodation was substandard too, with no working bathroom, no place to store food, and low-quality water.[49]

56.     In 2018, eighteen workers were rescued from the Fartura farm in Piuhmi, Minas Gerais, another farm certified by Starbucks's C.A.F.E. Practices program. These workers were subject to "degrading working conditions" and "wretched housing" that was covered in mold and infested with insects and rats, and that lacked proper water and sewage. Dead bats were present in the workers' water tank.[50]

57.     In 2018, a group of rescued workers filed complaints against Starbucks and five other coffee companies with Brazil's National Contact Point for the OECD Guidelines. The rescued workers alleged that Starbucks "failed to carry out proper human rights due diligence to identify, prevent, mitigate, and account for risks of forced labor and other rights violations in their supply chain, in breach of the OECD Guidelines." The workers asserted that while Starbucks had "policies and measures on paper," none was sufficient.[51]

---

https://www.somo.nl/bitter-brew/ ("Bitter Brew") (PDF to download).
   [47] *Id.* at 4.
   [48] It is at this time unknown to Plaintiff how SOMO, or Repórter Brazil (*see infra*) identified the farms certified by C.A.F.E. Practices, whereas Starbucks does not disclose the information publicly; Plaintiff believes the farms themselves may have been advertising the certification. Discovery is expected to yield more information.
   [49] *Id.* at 7.
   [50] *Id.*
   [51] *Id.* at 9. The complaint against Starbucks ultimately did not result in action.

16

58.     In an October 2023 report, Repórter Brasil uncovered that Brazilian workers were suffering "low wages, cold food and even slave labor on farms that supply" Starbucks.[52] Migrant workers especially were being "enticed by promises of high wages that will not be kept" and then forced into "exhausting working hours and poor living conditions" that often violate local law.[53]

59.     Repórter Brasil's findings were the result of its prior reporting, investigations of available records, and a field investigation covering 3,000 kilometers of the coffee-rich state of Minas Gerais. Repórter Brasil identified four farms holding Starbucks's C.A.F.E. Practices seal that had serious human rights violations.[54]

60.     One of the farms was the Mesas Farm in Campo Altos, Minas Gerais, where modern slavery was found just one month after the operation was certified under Starbucks's C.A.F.E. Practices. Among the workers rescued were children, a 15-year-old girl and two boys aged 16 and 17, who had worked outside without sun or rain protection and were forced to lift heavy loads such as 60-kilogram sacks of coffee. Workers were also mistreated. They were made to work without formal contracts and were not given "even the most basic tools for harvesting work," illegally forcing workers to buy their own. Workers had no access to toilets or a place to eat lunch.[55]

61.     When Repórter Brasil contacted Starbucks, Starbucks confirmed that the Mesas Farm had "active status" in the C.A.F.E. Practices program and said that Starbucks had no knowledge of any labor complaints, litigation, or claims against the farm's management.[56]

62.     Violations also occurred at the Cedro and Conquista farms, which operate as a joint entity and cover 500 acres in southern Minas Gerais. In July 2022, just one year after the entity was

---

[52] *Behind Starbucks Coffee*, *supra* note 21, at 1.
[53] *Id.* at 9.
[54] *Id.* at 10.
[55] *Id.* at 11-12.
[56] *Id.* at 12.

certified by C.A.F.E. Practices, "a 17-year-old boy was rescued from modern slavery" there. Additional testimonies and documents revealed that a 16-year-old boy had also been enslaved in 2022.[57]

63.    The workers at the Cedro and Conquista farms were also mistreated generally. They were not provided with water in the fields, nor were they given protective equipment like gloves, hats, or boots. Accommodations had no bedding or places to prepare meals. Workers were forced to pay for transportation to and from the farm, food during those journeys, and part of a cleaning person's salary, all of which is illegal under Brazilian law. "After all these discounts, [the workers'] wages disappeared."[58] When Repórter Brasil followed up, the employer had begun paying for transportation. In 2023, workers at Cedro and Conquista again reported being forced to buy their own farm equipment. They also reported having to work seven days a week, often at night, while being paid extremely low wages.[59]

64.    The Cedro farm maintained its C.A.F.E. Practices certification for over a full year after it became clear that child labor and worker abuse were taking place there. Per the owner, later, after a July 2023 audit, his C.A.F.E. Practices certification was not renewed. When contacted, Starbucks confirmed that the farm was not active in the program but refused to explain when or why the certification was withdrawn.[60]

65.    Other C.A.F.E. Practices-certified farms found to be mistreating workers were the Bernandes Estate Coffee farms in Patrocinio, Minas Gerais. Bernandes Estate Coffee was fined in 2019 and again in 2022 for not keeping records of workers' wages, not providing training, not providing personal protective equipment, not providing free first aid, not providing enough toilet

---

[57] *Id.* at 12-13.
[58] *Id.* at 13.
[59] *Id.* at 13-14.
[60] *Id.* at 13.

18

paper or access to bathing, not giving workers adequate places to eat meals, and not ensuring access to safe water. When Repórter Brasil investigated in 2023, it witnessed "the same problems pointed out by inspections in previous years." Yet Bernandes remained C.A.F.E. Practices certified.[61]

66.    Bernandes Estate Coffee charges workers rent for accommodations and owns the supermarket at which most workers do their shopping, essentially operating a company town.[62]

67.    Bernandes also violated Brazilian labor laws by recruiting workers from distant communities but forcing them to provide their own transportation to the farm before signing a contract. Such arrangements compel workers to sign whatever contract the employer offers since the workers, already in a precarious economic situation, find themselves in an unfamiliar area without employment, social connections, or a place to live.[63]

68.    When contacted by Repórter Brasil in August 2023, Starbucks confirmed that Bernandes was C.A.F.E. Practices-certified. Starbucks claimed that the farm was under "investigation," but would not reveal the nature or focus of that investigation, or when it had begun.[64]

69.    The Pedreia farm in Cabo Verde, Minas Gerais is yet another C.A.F.E. Practices-certified operation with serious human rights violations. The farm had been fined in 2021 and 2022 for forcing workers to pay for the fuel needed to harvest coffee and for not paying workers' benefits. Repórter Brasil investigated and found workers were not provided with a suitable place to eat in their accommodations, nor with bedding, blankets, and pillows. They were forced to both drink and bathe using water kept in an old fuel tank. And the employer refused to transport workers to the

---

[61] *Id.* at 14.
[62] *Id.* at 15.
[63] *Id.*
[64] *Id.*

hospital when sick or injured unless they were, in the words of an interviewee, "really dying."[65]

70.    In response to Repórter Brasil, Pedriea farm's management did not deny its business relationship with Starbucks but refused to answer any questions about the specifics of its C.A.F.E. Practices certification. Starbucks, when questioned, described the farm's certification as "expired." Starbucks would provide no further information, or explanation for what appeared to be years of human rights abuses on a C.A.F.E. Practices-certified farm before "expiration" of the certification.[66]

71.    Repórter Brasil also discovered slave labor on the Cedro II farm—a Starbucks C.A.F.E. Practices-certified supplier—in Minas Gerais in 2018. In addition to forced labor, workers at Cedro II were also mistreated by being forced to work 17-hour days and sleep in dirty housing.[67]

72.    Nor are these problems confined to Brazil. A November 2024 joint report by Coffee Watch and China Labor Watch, titled "Ghost Farms and Coffee Laundering," detailed "substantial abuses in Starbucks' . . . supply chain[ ], especially affecting Indigenous communities" in Yunnan, China, the primary coffee-growing region in that country. This conclusion was the result of a 2024 undercover investigation by China Labor Watch examining Yunnan farms supplying Starbucks. China Labor Watch interviewed 66 individuals including farmers, family members, and teachers from schools attended by the children of coffee-growing families.[68]

73.    China Labor Watch found extensive violations of human rights on Starbucks C.A.F.E. Practices-certified farms, as well as on "uncertified smallholder farms hidden in these

---

[65] *Id.* at 16.
[66] *Id.*
[67] Daniel Camargos, *Slave Labor Found at Second Starbucks-Certified Brazilian Coffee Farm*, Mongabay (May 3, 2019), https://news.mongabay.com/2019/05/slave-labor-found-at-second-starbucks-certified-brazilian-coffee-farm/.
[68] *Ghost Farms and Coffee Laundering: How Labor Violations Enter Starbucks' and Nestlé's Chinese Coffee Supply Chain* at 2, Coffee Watch (Nov. 29, 2024), https://coffeewatch.org/documents/22/Ghost-Farms-and-Coffee-Laundering_Abuses-in-Nestle-and-Starbucks-Chinese-coffe_fWDTlsu.pdf ("Coffee Watch China Report").

brands' supply chains."[69] Those violations included:

- Child labor. Children "help with tasks like picking coffee, especially during school breaks, despite exposure to agrochemicals in unsafe living conditions";

- Low wages. Coffee workers are barely paid minimum wage, and some rely on family members, including minors, for support;

- Excessive hours. Workers typically work seven days a week from sunrise to sunset, violating legal limits;

- Lack of medical insurance;

- No protective equipment. Workers without protection are exposed to injuries like hand wounds, bug bites, and to agrochemicals.[70]

74.     Starbucks appears "to be sustaining and reproducing existing social inequalities" in Yunnan. China Labor Watch found that ethnic minorities and indigenous groups are particularly vulnerable to poor working conditions, given discrimination and language barriers. Gender discrimination is also widespread, with jobs almost exclusively assigned to men or male-headed households, single women excluded entirely, and married women included only as part of their husbands' households.[71]

75.     Violations also occurred on Starbucks-supplying farms in Mexico. Mexican coffee farmers find themselves "trapped in abusive labor practices, a cycle of debt and systemic marginalization," a harm that disproportionately falls on indigenous people.[72] Starbucks and CI's C.A.F.E. Practices program "prioritizes the export of high-quality organic coffee at the expense of the socioeconomic well-being of coffee growers in regions such as the Sierra Madre de Chiapas and the El Triunfo Biosphere Reserve."[73]

---

[69] Presumably, China Labor Watch identified these "certified" farms, and the smaller farms, through undercover sources. Starbucks, notably, does not limit its Human Rights Representations to certified farms in its supply chain.

[70] *Id.* at 2-3.

[71] *Id.* at 22-24.

[72] *Press Release: Exploitation and Opacity: The Hidden Reality of Mexican Coffee in Nestlé and Starbucks Supply Chains*, Coffee Watch (Feb. 14, 2025), https://coffeewatch.org/exploitation-and-opacity/.

[73] Coffee Watch Mexico Report, *supra* note 4, at 67.

76.     Local cooperative coffee producers in Mexico have "denounced" Starbucks and CI as "systematically undermin[ing]" them. Starbucks forces them to pay large amounts to remain in the system and deliberately seeks to break up local cooperatives by promising individual workers greater pay if they leave the local cooperatives—only to renege on those promises once the worker had agreed to leave the cooperative and is on his own. Doing so helps Starbucks weaken the collective bargaining power of Mexican workers.[74]

77.     This record simply cannot be squared with Starbucks and Conservation International's Human Rights Representations. Starbucks, backed by Conservation International, makes a bevy of representations about how much Starbucks cares about human rights, about the extensive and high standards they claim to apply, and about how close to perfection Starbucks has come. Starbucks explicitly tells consumers that it is "99%" of the way to perfect ethical sourcing.

78.     The picture on the ground, to the extent it is visible without discovery, is nowhere near the nigh-on perfect ethical sourcing Starbucks and Conservation International claim. Over and over again, even setting aside the problems on non-certified smallholder farms in the supply chain, C.A.F.E. Practices-certified farms themselves have been found to engage in extensive human rights violations including slavery, child labor, forcing workers to work in dangerous conditions without protective gear, forcing workers to live in utterly unacceptable conditions, and myriad other offenses. This all occurred despite Starbucks's supposedly extensive safeguards.

79.     Given the pervasiveness of the human rights violations uncovered, it is impossible that they are occurring in less than 1% of Starbucks's supply operations as Starbucks claims.

80.     Reasonable consumers do not know the conditions faced by coffee farmers growing coffee for Starbucks in rural Brazil and China. They rely on Starbucks's and Conservation

---

[74] *Id.* at 67-68.

International's representations. A reasonable consumer who reads those representations comes away with an image of Starbucks as in control of the conditions on its suppliers' farms, applying stringent human rights protections consistently and effectively, and having eradicated human rights violations across nearly the entirety of its supply chain. But none of that is true, as demonstrated by the widespread and recurring human rights violations at Starbucks supplier farms.

### C.    Defendant's Human Rights Representations Are Material to Consumers.

81.    Consumers care deeply about exploitive labor practices in supply chains. A national survey found that "60% of consumers would stop using a product if they knew that human trafficking or forced labor was used to create it."[75]

82.    A majority of consumers would stop buying brands that they believe are unethical. Moreover, "35 percent of consumers would stop buying from brands they perceive as unethical even if there is no substitute available."[76]  Additionally, 63 percent of "consumers feel that ethical issues are becoming more important."[77]

83.    A survey of 5,000 consumers showed that significant segments of the national consumer base prioritize "more transparency from food producers and retailers," "accountability and transparency through the entire food supply chain," and "fair treatment of workers."[78]

84.    Moreover, more than 75% of consumers said they were not likely to continue purchasing from clothing brands if they knew those brands were made with child labor.[79]

---

[75] Stephen DeAngelis, *Even If Consumers Aren't Aware of Human Trafficking, Companies Need to Be*, Enterra Solutions, (Mar. 6, 2020), https://www.enterrasolutions.com/insights-blog/even-if-consumers-aren-t-aware-of-human-trafficking-companies-need-to-be/.

[76] *56% of Americans Stop Buying From Brands They Believe Are Unethical*, Mintel (Nov. 18, 2015), https://bit.ly/3ZmfXlC.

[77] *Id.*

[78] *Consumer Survey Shows Changing Definition of Food Safety*, Food Safety News (Feb. 4, 2016, 12:59 PM), https://www.foodsafetynews.com/2016/02/123246/.

[79] *Majority (55%) of Americans Willing to Pay More for Clothing Not Made Using Child Labor*, Ipsos (July 18, 2013), https://www.ipsos.com/en-us/majority-55-americans-willing-pay-more-clothing-not-made-using-child-labor.

85.    Another survey, commissioned by the National Consumer League, "confirmed that Americans seem concerned that the food they purchase is not tainted by child labor. Nearly 6 in 10 survey respondents—59 percent—disagreed that 'it is acceptable for a child under 14 to work for wages in the fields, harvesting produce to be sold in grocery stores.' An even larger percentage—67 percent—said that the U.S. should not import products made or harvested by children under the age of 14."[80]

86.    Defendant's Human Rights Representations, given Starbucks's failure to live up to the lofty rhetoric, are both misleading and consequential to such consumers.

## II.    Defendant Falsely Represents That Starbucks Coffee Is Sustainable.

87.    Both Starbucks and Conservation International make representations that Starbucks coffee is sustainability sourced (collectively, the "Sustainability Representations"[81]). They assert that Starbucks is a good steward, protecting forests, water, and biodiversity, and is benefiting, not harming, the environment.

88.    Defendant's Sustainability Representations are false and misleading. The reality on the ground is that Starbucks contributes to deforestation and, by its own metrics, has made little progress on many environmental fronts.

89.    These misrepresentations and failures are material to consumers, who care a great deal about sustainability in supply chains and are willing to spend more for sustainable products.

### A.    Defendant Makes Representations That Starbucks Coffee Is Sustainable.

90.    Under "Our Mission" on Starbucks's website, among its "Promises," Starbucks

---

[80] Reid Maki, *American Public: Young Farmworkers Deserve Equal Protection of Child Labor Laws–Consumer Survey Finds Americans Concerned about Youth Working in Ag*, The Child Labor Coalition (July 21, 2011), https://stopchildlabor.org/american-public-young-farmworkers-deserve-equal-protection-of-child-labor-laws-consumer-survey-finds-americans-concerned-about-youth-working-in-ag-2/.

[81] This term is inclusive of all the representations identified in this Section. Plaintiff reserves the right to amend this Complaint to include additional representations if and when they are discovered.

24

includes "Our Environmental Promise—Give more than we take."[82] This includes a goal of reducing Starbucks's "water and carbon footprint by half by 2030."[83] Starbucks is a founding member of Transform to Net Zero and represents that it is working to "accelerate the transition to a net zero economy no later than 2050."[84]

91.    Starbucks tells consumers that its combination of efforts "showcase our decades-long commitment to find solutions to mitigate the impacts of climate change and ensure a sustainable future of coffee for all."[85]

92.    On the "Farmer Promise" page on its website, Starbucks promises that it is "working to conserve and restore the forests that are critically important to agriculture systems," and states, "Water stewardship and soil health are important parts of our strategy." Starbucks's purported commitment to sustainability also includes "preserving and enhancing biodiversity."[86]

93.    In its 2023 Global Impact Report, Starbucks promises[87]:

>    "By 2030, Starbucks is aiming to achieve carbon-neutral green coffee and conserve water usage in green coffee processing by 50%."

>    "Water stewardship and soil health are important parts of our strategy."

>    "Protecting and restoring forests addresses a serious threat to coffee farms and communities around the world." This includes "preserving and enhancing biodiversity."

94.    Starbucks claims that its C.A.F.E. Practices program "promotes sustainable agriculture practices including measures to protect water quality, improve soil health, preserve biodiversity, reduce agrochemical use, and conserve water and energy." It promises "zero

---

[82] *Our Mission*, Starbucks (2025), https://about.starbucks.com/mission/ (last visited May 2, 2025).
[83] *Sustainability*, Starbucks (2025), https://about.starbucks.com/sustainability/ (last visited May 2, 2025); 2023 Global Impact Report, *supra* note 3, at 14.
[84] 2023 Global Impact Report, *supra* note 3, at 13.
[85] *Id.*
[86] *Our Farmer Promise*, Starbucks (2025), https://about.starbucks.com/our-farmer-promise-ensure-the-future-of-coffee-for-all/ (last visited May 2, 2025).
[87] 2023 Global Impact Report, *supra* note 3, at 20.

tolerance" for converting forests to agricultural use after 2004.[88]

95.     Those C.A.F.E. Practices, discussed above, have minimum requirements for participation addressing sustainability standards, including:

- No deforestation or conversion of natural ecosystems or primary forest to agriculture since January 1, 2004, within the supplier entity;

- No conversion to forest for coffee production since December 31, 2020;

- Any removal of native trees is done in compliance with law; and

- All conservation areas and requirements are preserved.[89]

96.     Conservation International makes similar representations about Starbucks being a sustainable company. On CI's website, it claims that Starbucks and CI "have created a new way to produce coffee: one that is sustainable, transparent, and good for people and the planet" and are "are sparking an industry-wide movement to make coffee the first sustainable agricultural product in the world."[90]

97.     On that same page, CI instructs visitors to "Follow Starbucks' Journey to 100% Ethically Sourced Coffee" by viewing a YouTube video.[91] That video asserts that "together, [Starbucks & CI] have created a new way to buy their coffee, one that is sustainable, transparent, and good for people and the planet."[92]

**B.     Defendant's Sustainability Representations Are Misleading to Consumers.**

98.     Coffee production is the sixth-leading driver of deforestation worldwide, exacerbating environmental problems and causing biodiversity loss.[93]

---

[88] *C.A.F.E. Practices: Starbucks Approach to Ethically Sourcing Coffee*, *supra* note 19.
[89] C.A.F.E. Standards, *supra* note 20, at 18.
[90] *Starbucks + Conservation International*, *supra* note 39.
[91] *Id.*
[92] *Follow Starbucks' 15 Year Journey to 100% Ethically Sourced Coffee | Conservation International*, *supra* note 42.
[93] Coffee Watch Mexico Report, *supra* note 4, at 80.

99.    "[D]eforestation remains a significant issue in Starbucks' coffee supply chain." Land clearing for coffee farming has disrupted ecosystems and harmed biodiversity in places including Brazil, Ethiopia, and China. This has exposed gaps in Starbucks' oversight mechanisms."[94]

100.    In its 2024 report, Coffee Watch investigated multiple Starbucks C.A.F.E. Practices-certified farms in Yunnan, China, where extensive deforestation has taken place. At the Tian Yu Coffee Farm, satellite comparisons of the land from 2001-2010 and 2011-2023 show deforestation expanding from 11.8 hectares to 32.7 hectares:



This occurred despite Starbucks's stated policy of no deforestation in its supply chain since 2004.[95]

101.    Deforestation is occurring in Mexico as well, with accounts from coffee growers and satellite imagery showing "deforestation proceed[ing] unchecked."[96]

102.    Coffee farming is carbon emission-heavy, as it involves mechanization, intensive irrigation, and heavy fertilizer use, all of which require or are made from carbon fuels. Farming

---

[94] *Starbucks Sustainability: Progress, Challenges, and Lessons for ESG Managers*, Zuno Carbon (Dec. 12, 2024), https://www.zunocarbon.com/blog/starbucks-sustainability-progress-challenges-and-lessons.
[95] Coffee Watch China Report, *supra* note 67, at 9.
[96] Coffee Watch Mexico Report, *supra* note 4, at 8, 86-89.

alone accounts for between 40 and 80 percent of the total emissions from coffee.[97]

103.    Despite aiming for deep emissions reductions, Starbucks is instead creating "rising carbon emissions."[98] Starbucks is "losing ground" on its emissions reductions goal, seeing increases in emissions between 2019 and 2023, not reductions.[99]

104.    Similarly, the creation of waste, particularly plastic waste and waste driven by disposable packaging, is a major problem for Starbucks's sustainability. Packaging waste from mobile and drive-thru orders has "surged."[100]

105.    Starbucks's 2023 Global Impact Report tracks its progress toward its environmental goals compared to 2019 baselines. Greenhouse gas emissions and waste were up significantly, as was the amount of fossil fuel-derived materials used for customer packaging and the use of plastic:

- In 2022, greenhouse gas emissions were 9% higher than the 2019 baseline, while in 2023, they were still 8% higher;

- In 2022, the amount of waste sent to landfill was 5% higher than it had been in 2019, and in 2023, the amount of waste sent to landfill was 13% higher than in 2019; and

- In 2022, the amount of fossil fuel-derived materials in customer packaging had increased 10% compared to 2019, and in 2023, the number was 11%.[101]

106.    While water use had declined compared to 2019, there had been no progress between 2022 and 2023. Water withdrawals in 2022 were down 9% compared to the 2019 baseline, which was the same number reported for 2023.[102]

107.    Starbucks's and CI's representations are, therefore, misleading. Far from being a

---

[97] Luciano Rodrigues Viana et al., *Here's How Your Cup of Coffee Contributes to Climate Change*, The Conversation (Jan. 5, 2023, 4:04 PM), https://theconversation.com/heres-how-your-cup-of-coffee-contributes-to-climate-change-196648.

[98] *Starbucks Sustainability: Progress, Challenges, and Lessons for ESG Managers*, *supra* note 94.

[99] Zoya Mirza, *Starbucks Loses Ground on Emissions Reduction, Sets New 2030 Sustainability Goals*, ESGDive (Mar. 4, 2024), https://www.esgdive.com/news/starbucks-loses-ground-on-emissions-reduction-sets-new-2030-sustainability/709214/.

[100] *Starbucks Sustainability: Progress, Challenges, and Lessons for ESG Managers*, *supra* note 94.

[101] 2023 Global Impact Report, *supra* note 3, at 39-40.

[102] *Id.* at 39.

first-in-class environmental steward on a path to deep decarbonization and waste reduction, Starbucks is contributing to deforestation across the globe and losing ground on both emissions and waste.

### C.    Defendant's Sustainability Representations Are Material to Consumers.

108.    Consumers care about environmentally conscious practices in supply chains.

109.    A survey of 5,000 United States consumers showed that significant segments prioritize "more transparency from food producers and retailers" and "accountability and transparency through the entire food supply chain."[103]

110.    A recent survey found that "more than half (58 percent) of consumers indicated they are willing to spend more money on products that are deemed sustainable or environmentally friendly."[104]

111.    Another survey concluded that 77% of consumers are concerned about sustainability specifically as it relates to "day-to-day decisions about food."[105]

112.    A 2023 study by NielsenIQ found that 78% of United States consumers say that a "sustainable" lifestyle is "important to them."[106]

113.    Deloitte's 2024 "The Sustainable Consumer" report states that "one in four consumers are prepared to pay more for sustainability."[107]

---

[103] *Consumer Survey Shows Changing Definition of Food Safety*, *supra* note 78.
[104] *Survey Reveals Consumers Prioritize Purchasing Sustainable Products and Desire Greater Transparency from Companies on Sustainability Progress*, PR Newswire (Nov. 15, 2023, 10:00 AM), https://www.prnewswire.com/news-releases/survey-reveals-consumers-prioritize-purchasing-sustainable-products-and-desire-greater-transparency-from-companies-on-sustainability-progress-301988839.html.
[105] Louise Berrebi et al., *Whetting Consumers' Appetite for Sustainable Foods*, BCG (May 30, 2023), https://www.bcg.com/publications/2023/whetting-consumers-appetite-for-sustainable-foods.
[106] *Consumers Care About Sustainability—And Back It Up with Their Wallets*, McKinsey & Co. (Feb. 6, 2023), https://www.mckinsey.com/industries/consumer-packaged-goods/our-insights/consumers-care-about-sustainability-and-back-it-up-with-their-wallets#/.
[107] Céline Fenech et al., *The Sustainable Consumer: Understanding Consumer Attitudes to Sustainability and Sustainable Behaviours* at 25, Deloitte (2024), https://www2.deloitte.com/uk/en/pages/consumer-business/articles/sustainable-consumer-what-consumers-care-about.html (PDF to download).

114.    The Federal Trade Commission ("FTC") has specifically acknowledged that "sustainable" claims are material to consumers.[108]

115.    The FTC has determined that unqualified general environmental benefit claims such as "sustainable" are "likely [to] convey that the product . . . has specific and far-reaching environmental benefits and may convey that the item . . . has no negative environmental impact." The FTC has admonished companies not to use unqualified claims such as "sustainable" due to its determination that "it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims."[109]

116.    Researchers have found that consumers seek out and are willing to pay significantly more for products labeled as "ecologically sustainable."[110]

117.    Given widespread consumer concern about sustainability, Defendant's Sustainability Representations are material to many consumers. Starbucks and CI are well aware of this, and making the Sustainability Representations ensures that Starbucks captures more of these concerned consumers' spending.

### III.    Starbucks Falsely Represents That its Decaf House Blend Medium Roast Coffee Is Produced in a Safe Process.

118.    Starbucks sells many decaffeinated coffees including Decaf House Blend Medium Roast. It tells consumers that it produces decaf coffee through a safe process, and represents that its Decaf House Blend Medium Roast coffee contains only 100% arabica coffee.[111]

119.    Laboratory testing of Starbucks's Decaf House Blend Medium Roast coffee,

---

[108] *See* FTC Green Guides, 16 C.F.R. § 260.4(b) (2014).

[109] *Id.*

[110] Loren McClenachan et al., *Fair Trade Fish: Consumer Support for Broader Seafood Sustainability*, 17 Fish & Fisheries 825-838, 825 (2016), https://doi.org/10.1111/faf.12148.

[111] This term is inclusive of all the representations identified in this Section. Plaintiff reserves the right to amend this Complaint to include additional representations if and when they are discovered.

however, has detected the presence of three chemicals with the potential to harm human health: methylene chloride, benzene, and toluene, rendering Starbucks's representations false.

120.    Consumers care deeply about their health and about exposure to potentially dangerous chemicals, and so Starbucks's misrepresentations are material.

**A.    Starbucks Represents That its Decaf House Blend Medium Roast Coffee Is Made in a Safe Manner.**

121.    On its website, Starbucks describes the decaffeination processes used to produce its decaf Products. Starbucks decaf coffees are all decaffeinated using one of three processes. The "most common" process is the "Direct Contact Method," involving the use of a chemical solvent on the coffee beans. Another method is the Swiss Water Process, which avoids "directly" applying solvents to the coffee beans. The final method is the Natural Decaffeination Process, involving the application of liquid carbon dioxide to the beans. Starbucks does not acknowledge which method it uses for which decaf Products beyond its general acknowledgement that the Direct Contact method is "the most common." Starbucks claims, however, that all three methods are "safe and effective way[s]" to decaffeinate coffee and are consistent with the "high standard put in place by the U.S. Food and Drug Administration."[112]

122.    Starbucks sells its Decaf House Blend Medium Roast Coffee and represents that its ingredients are limited to "100% arabica coffee."[113]

**B.    Starbucks's Safety Representations Are False and Misleading to Consumers.**

123.    Independent testing of Starbucks's Decaf House Blend Medium Roast Coffee, facilitated by Plaintiff's counsel, detected the presence of methylene chloride, benzene, and toluene at unsafe concentrations.

---

[112] *What is Decaffeinated Coffee?*, Starbucks Coffee At Home, https://athome.starbucks.com/learn/what-is-decaffeinated-coffee (last visited Mar. 4, 2025).

[113] *Decaf House Blend*, Starbucks Coffee at Home, https://athome.starbucks.com/products/decaf-house-blend-ground (last visited Apr. 4, 2025).

124.    Eurofins EAG Laboratories, located in Maryland Heights, Missouri, tested Starbucks Decaf House Blend Medium Roast Coffee between January 14 and 17, 2025, using Purge and Trap Gas Chromatography with Mass Spectrometry (P&T-GC/MS) to quantify methylene chloride, ethyl acetate, benzene, and toluene.

125.    The testing detected methylene chloride at 22 parts per billion. There is no amount of methylene chloride that is safe to consume. In 2022, the EPA warned in its Final Risk Evaluation that "consumers should not use any products containing methylene chloride," as no amount of the chemical is safe for consumption and it "presents unreasonable risk to human health."[114] The State of California has also added methylene chloride to its Proposition 65 list "because it can cause cancer" and "[d]uring pregnancy, methylene chloride can pass from mother to baby."[115]

126.    Testing detected benzene at 28 parts per billion. Benzene is a known carcinogen and can cause blood disorders in humans.[116] The EPA sets the maximum level of benzene in drinking water at 5 parts per billion.[117] The levels detected in the coffee here far exceeded that limit.

127.    Testing detected toluene at 87 parts per billion. Toluene is "included in *Reproductive and Developmental Toxicants*, a 1991 report published by the U.S. General Accounting Office (GAO) that lists 30 chemicals of concern because of widely acknowledged reproductive and developmental consequences."[118]

128.    On information and belief, these chemicals ended up in the Decaf House Blend

---

[114] *Final Risk Evaluation for Methylene Chloride*, EPA, https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/final-risk-evaluation-methylene-chloride (last visited Mar. 4, 2025).

[115] *Methylene Chloride (Dichloromethane)*, Proposition 65 Warnings, Cal. Env't Prot. Agency, https://www.p65warnings.ca.gov/fact-sheets/methylene-chloride-dichloromethane (last visited May 6, 2025).

[116] *Benzene*, U.S. Ctr. for Disease Control and Prevention (Sept. 6, 2024), https://www.cdc.gov/chemical-emergencies/chemical-fact-sheets/benzene.html.

[117] *Questions and Answers on the Occurrence of Benzene in Soft Drinks and Other Beverages*, U.S. Food & Drug Admin. (Feb. 25, 2022), https://www.fda.gov/food/environmental-contaminants-food/questions-and-answers-occurrence-benzene-soft-drinks-and-other-beverages.

[118] *Medical Management Guidelines for Toluene*, Agency for Toxic Substances & Disease Registry, https://wwwn.cdc.gov/TSP/MMG/MMGDetails.aspx?mmgid=157&toxid=29 (last visited May 6, 2025).

Medium Roast from the decaffeination process—meaning that Starbucks's representation that its Decaf House Blend Medium Roast is decaffeinated in a "safe and effective" way is false because of the presence of these harmful chemicals.

129.    Starbucks's representation that the Decaf House Blend Medium Roast's ingredients consist only of "100% arabica coffee" are false, misleading, and/or incomplete, as Starbucks fails to disclose the presence of methylene chloride, benzene, and toluene.

**C.    Starbucks's Safety and Efficacy Representations Are Material to Consumers.**

130.    There is no doubt that consumers care a great deal about whether they are exposed to potentially harmful substances when they drink coffee.

131.    Consumers have extremely strong and nearly unanimous feelings about being exposed to potentially harmful chemicals. In a survey of 1,200 registered voters, 93% agreed, and 63% strongly agreed, that companies "should do a better job of removing harmful chemicals from consumer products." Similarly, 93% agreed, and 57% strongly agreed, that it is "important for companies to keep harmful chemicals out of everyday products, even if it increases costs for some products."[119]

132.    Moreover, most Americans drink coffee daily. A 2025 survey found that 66% of American adults had coffee in the last day—more than any other beverage, including water.[120]

133.    Also, decaffeinated coffee is usually consumed by pregnant women or people with health conditions that require caution around caffeine.[121] This shows that the decision to purchase

---

[119] *Public Opinion on Chemicals*, UCSF Program on Reproductive Health and the Environment (Oct. 11, 2022), https://prhe.ucsf.edu/public-opinion-chemicals.

[120] *More Americans Drink Coffee Each Day Than Any Other Beverage, Bottled Water Back in Second Place, supra* note 2.

[121] Janae Bowens, *Decaf Dilemma: Critics Demand Ban on Popular Method Over Cancer Risk Concerns*, CBS Austin (May 31, 2024, 1:24 PM), https://cbsaustin.com/news/nation-world/decaf-dilemma-critics-demand-ban-on-popular-method-over-cancer-risk-concerns-methylene-chloride-european-beans-clean-label-project-environmental-defense-fund.

decaffeinated coffee is health-based for many consumers. In fact, one survey found that 47.4% of consumers who chose to drink decaffeinated coffee did so due to "health concerns and caffeine sensitivity."[122]

134.    This is, of course, all common sense. Potential contamination in coffee from Starbucks, *the* quintessential coffee chain and an overwhelming presence across America, is of great importance, and misrepresentations on that subject are material to consumers.

## CLASS ALLEGATIONS

135.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

136.    This action is maintainable as a class action under Rules 23(b)(3) of the Federal Rules of Civil Procedure.

137.    The class definition(s) may depend on the information obtained throughout discovery. Notwithstanding, at this time, Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all consumers who purchased Starbucks coffee Products within the United States during the applicable statute of limitations period (the "Class Period") and until the date of class certification.

138.    Included in the Class, to the extent necessary, is a subclass of all persons who purchased the Products in New York during the Class Period (the "New York Subclass").

139.    Included in the Class, to the extent necessary, is a subclass of all persons who purchased Starbucks Decaf House Blend Medium Roast Coffee during the Class Period (the "Decaf Subclass").

140.    Included in the Class, to the extent necessary, is a subclass of all persons who

---

[122] Dr. Maria Panagiotidi, *Decaf Coffee Survey Results Part I*, Decaf Before Death (Aug. 11, 2024), https://decafbeforedeath.substack.com/p/decaf-coffee-survey-results-part.

purchased the Starbucks Decaf House Blend Medium Roast Coffee in New York during the Class Period (the "New York Decaf Subclass").

141.    Excluded from the Class are (1) Defendant, any entity or division in which Defendant has a controlling interest, and Defendant's legal representatives, officers, directors, assigns, and successors; and (2) the judge to whom this case is assigned and the judge's staff.

142.    Plaintiff brings the Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

143.    Plaintiff reserves the right to amend the Class and Subclass definitions if further information and discovery indicates that the definitions should be narrowed, expanded, or otherwise modified.

144.    All members of the Class were and are similarly affected by Defendant's deceptive labeling and advertising regarding Starbucks's coffee, and the relief sought herein is for the benefit of Plaintiff and members of the Class.

I.    **Numerosity**

145.    Plaintiff does not know the exact number of the Class members at this time. Based on the wide distribution of Starbucks's coffee Products,[123] Plaintiff believes that the Class comprises many thousands of consumers. The number of consumers in the Class is so large as to make joinder impracticable. Class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

II.    **Commonality**

146.    There is a well-defined commonality of interest in the questions of law and fact in

---

[123] *See Sales of Selected Leading Coffee Shop and Cafe Chains in the United States in 2023, supra* note 7.

this case. Questions of law and fact common to the members of the Class and/or Subclasses that predominate over questions that may affect individual Class members include:

- Whether Defendant is responsible for the labeling and advertising at issue;

- Whether the labeling and advertising of the Products was unfair, false, deceptive, fraudulent, and/or unlawful;

- Whether the labeling and advertising of the Products is likely to mislead a reasonable consumer;

- What reasonable consumers understand Defendant's Human Rights Representations to convey about the treatment of workers on farms supplying Starbucks coffee;

- What reasonable consumers understand Defendant's Sustainability Representations to convey about the environmental impact of the farms supplying Starbucks coffee;

- What reasonable consumers understand Starbucks's Safe and Effective Representations to convey about the content of Starbucks Decaf House Blend Medium Roast Coffee;

- Whether Defendant was unjustly enriched; and

- Whether Defendant's conduct injured Plaintiff and Class members.

## III.    Typicality

147.    Plaintiff's claims are typical of those of the Class, as the claims arise from the same course of conduct by Defendant and the relief sought within the Class is common to all the Class members. Plaintiff, like all Class members, relied on Defendant's false and misleading representations and purchased Products (*e.g.*, Starbucks Decaf House Blend Medium Roast Coffee), or purchased more of them, or paid more for them, than he would have paid if the Products had been properly labeled, and so sustained injury from Defendant's wrongful conduct. Further, there are no defenses available to Defendant that are unique to Plaintiff.

## IV.    Adequacy

148.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is an

adequate representative of the Class and Subclasses because his interests do not conflict with the interests of the Class or Subclass members he seeks to represent, and he has retained counsel competent and experienced in both consumer protection and class action litigation. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the Class. Undersigned counsel have represented consumers in many actions seeking to protect against fraudulent and deceptive practices.

## V.    Predominance and Superiority of Class Action

149.    The prerequisites to maintaining a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) are met because questions of law and fact common to each Class member predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

150.    Individual joinder of the Class members is not practicable, and questions of law and fact common to the Class and Subclasses predominate over questions affecting only individual members. Each Class member has been damaged and is entitled to recovery because of the violations alleged herein.

151.    Moreover, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class action treatment will allow those people similarly situated to litigate their claims in a manner that is most efficient and economical for the parties and the judicial system.

152.    Plaintiff is unaware of any difficulties in managing this case that would preclude proceeding as a class action.

153.    Given the large number of consumers of the Products, allowing individual actions

to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

## CAUSES OF ACTION

### COUNT I
**Violation of New York General Business Law Section 349**
**(On Behalf of Plaintiff and the New York Subclass)**

154.     Plaintiff repeats and realleges all allegations contained in the foregoing paragraphs.

155.     The acts of Defendant, as described above, constitute unlawful, deceptive, and fraudulent business acts and practices.

156.     Defendant has marketed the Products with the Human Rights Representations and Sustainability Representations when, in fact, Starbucks regularly sources coffee from farms engaging in human rights violations and destructive environmental behavior, despite those farms being part of Starbucks's and CI's C.A.F.E. Practices program.

157.     Defendant has violated, and continues to violate, Section 349 of the New York General Business Law, which makes deceptive acts and practices unlawful. As a direct and proximate cause of Defendant's violation of Section 349, Plaintiff and other members of the New York Subclass have suffered damages in an amount to be determined at trial.

158.     Defendant's improper consumer-oriented conduct is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass members to purchase and to pay the requested price for the Products when they otherwise would not have or would not have purchased as much.

159.     Defendant knows what representations it made on the packaging, on its website, and in public reports. Defendant also knows how the coffee is actually being sourced and produced. Defendant, thus, knows, or should know, that the Products are being falsely advertised.

160.    Defendant thus makes these misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

161.    Plaintiff and the New York Subclass members have been injured by their purchase of the Products, which were worth less than what they bargained and/or paid for, and which they selected over other products that may have been truthfully marketed.

162.    Defendant's advertising and on-package representations induced Plaintiff and the New York Subclass members to buy the Products, to buy more of the Products, and/or to pay the price requested for those Products.

163.    As a direct and proximate cause of Defendant's violation of Section 349, Plaintiff and other members of the New York Subclass paid for falsely advertised Products, and, as such, have suffered damages in an amount to be determined at trial.

164.    Therefore, Defendant is liable to Plaintiff and the other members of the New York Subclass for actual damages, for treble damages in the Court's discretion, or for fifty dollars ($50) for each purchase of a Starbucks coffee Product (whichever is greatest); attorneys' fees; and the costs of this suit.

165.    Defendant continues to engage in the deceptive conduct, and, upon information and belief, will continue to do so. Members of the New York Subclass that Plaintiff seeks to represent are purchasing, and will continue to purchase, the misrepresented Products.

166.    The unfair and deceptive acts and practices of Defendant, as described above, present an ongoing threat to Plaintiff and the other members of the New York Subclass.

**COUNT II**
**Violation of New York General Business Law Section 350**
**(On Behalf of Plaintiff and the New York Subclass)**

167.    Plaintiff repeats and realleges all allegations contained in the foregoing paragraphs.

168.     The acts of Defendant, as described above, constitute unlawful, deceptive, and fraudulent business acts and practices.

169.     New York General Business Law Section 350 provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

170.     GBL Section 350-A defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

171.     Plaintiff and the members of the New York Subclass are consumers who purchased the Products in the State of New York.

172.     Defendant is engaged in the conduct of business, trade, or commerce within the meaning of GBL Section 350.

173.     Defendant's representations made by statement, word, design, device, sound, or any combination thereof, and also the extent to which Defendant's advertising fails to reveal material facts with respect to the Products, as described above, constitute false advertising in violation of the New York General Business Law.

174.     Defendant's false advertising was knowing and intentional.

175.     Defendant's actions led to direct, foreseeable, and proximate injury to Plaintiff and members of the New York Subclass.

176.     As a consequence of Defendant's deceptive marketing, Plaintiff and the other members of the New York Subclass suffered an ascertainable loss, insofar as they would not have purchased the Products had they known the truth, would not have paid the price requested, and/or would have purchased fewer of the Products; moreover, as a result of Defendant's conduct, Plaintiff and the other members of the New York Subclass received coffee of less value than what they paid for.

177.     By reason of the foregoing, Defendant is liable to Plaintiff and the other members of the New York Subclass for actual damages, for treble damages in the Court's discretion, or for fifty dollars ($50) for each purchase of a Starbucks coffee Product (whichever is greatest); attorneys' fees; and the costs of this suit.

178.     Defendant continues engaging in the challenged deceptive conduct, and, upon information and belief, will continue to do so. Members of the New York Subclass that Plaintiff seeks to represent are purchasing, and will continue to purchase, the misrepresented Products.

<u>**COUNT III**</u>
**Violation of New York General Business Law Section 349**
**(On Behalf of Plaintiff and the New York Decaf Subclass)**

179.     Plaintiff repeats and realleges all allegations contained in the foregoing paragraphs.

180.     Defendant markets its Decaf House Blend Medium Roast with its Safe and Effective Representations when, in fact, laboratory testing shows that Decaf House Blend Medium Roast contains chemicals that are potentially harmful to human health.

181.     Defendant has violated, and continues to violate, Section 349 of the New York General Business Law, which makes deceptive acts and practices unlawful. As a direct and proximate cause of Defendant's violation of Section 349, Plaintiff and the New York Decaf Subclass have suffered damages in an amount to be determined at trial.

182.     Defendant's improper consumer-oriented conduct is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Decaf Subclass members to purchase and to pay the requested price for Decaf House Blend Medium Roast when they otherwise would not have or would not have purchased as much.

183.     Defendant knows what representations it made on its its websites and on Decaf House Blend Medium Roast's packaging. It also knows what was in its coffee, and how safe and effective its decaffeination processes are. It thus knows, or should have known, that Decaf House

Blend Medium Roast is being falsely advertised.

184.    Defendant, thus, made and continues to make misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

185.    Plaintiff and the New York Decaf Subclass members have been injured by their purchase of Starbucks's Decaf House Blend Medium Roast, which was worth less than what they bargained and/or paid for, and which they selected over other products that may have been truthfully marketed.

186.    Defendant's advertising induced Plaintiff and the New York Decaf Subclass members to buy Decaf House Blend Medium Roast, to buy more of it, and/or to pay the price requested for it.

187.    As a direct and proximate cause of Defendant's violation of Section 349, Plaintiff and other members of the New York Decaf Subclass paid for falsely advertised Decaf House Blend Medium Roast and, as such, have suffered damages in an amount to be determined at trial.

188.    Therefore, Starbucks is liable to Plaintiff and the other members of the New York Decaf Subclass for actual damages, for treble damages in the Court's discretion, or for fifty dollars ($50) for each purchase of a Starbucks coffee Product (whichever is greatest); attorneys' fees; and the costs of this suit.

189.    Defendant continues to engage in deceptive conduct, and, upon information and belief, will continue to do so. Members of the New York Decaf Subclass that Plaintiff seeks to represent are purchasing, and will continue to purchase, the misrepresented coffee. The unfair and deceptive acts and practices of Defendant, as described above, present an ongoing threat to Plaintiff and the other members of the New York Decaf Subclass.

## COUNT IV
**Violation of New York General Business Law Section 350**
**(On Behalf of Plaintiff and the New York Decaf Subclass)**

190.    Plaintiff repeats and realleges all allegations contained in the foregoing paragraphs.

191.    New York General Business Law Section 350 provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

192.    GBL Section 350-A defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

193.    Plaintiff and the members of the New York Decaf Subclass are consumers who purchased Starbucks Decaf House Blend Medium Roast in the State of New York.

194.    Defendant is engaged in the conduct of business, trade, or commerce within the meaning of GBL Section 350.

195.    Defendant's representations were and are made by statement, word, design, device, sound, or any combination thereof, and also the extent to which Defendant's advertising fails to reveal material facts with respect to the Decaf House Blend Medium Roast, as described above, constitute false advertising in violation of the New York General Business Law.

196.    Defendant's false advertising is knowing and intentional.

197.    Defendant's actions led to direct, foreseeable, and proximate injury to Plaintiff and members of the New York Decaf Subclass.

198.    As a consequence of Defendant's deceptive marketing, Plaintiff and the other members of the New York Decaf Subclass suffered an ascertainable loss, insofar as they would not have purchased the Decaf House Blend Medium Roast had they known the truth, would not have paid the price requested, and/or would have purchased fewer of the Products; moreover, as a result of Starbucks' conduct, Plaintiff and the other members of the New York Decaf Subclass received a

good of less value than what they paid for.

199.    By reason of the foregoing, Starbucks is liable to Plaintiff and the other members of the New York Subclass for actual damages, for treble damages in the Court's discretion, or for fifty dollars ($50) for each purchase of a Starbucks coffee Product (whichever is greatest); attorneys' fees; and the costs of this suit.

200.    Defendant continues engaging in the challenged deceptive conduct, and, upon information and belief, will continue to do so. Members of the New York Subclass that Plaintiff seeks to represent are purchasing, and will continue to purchase, the misrepresented coffee.

## COUNT V
### Violation of State Consumer Protection Statutes
### (on Behalf of Plaintiff and the Class)

201.    Plaintiff repeats and realleges all allegations contained in the foregoing paragraphs.

202.    Defendant has marketed the Products with the Human Rights Representations and Sustainability Representations when, in fact, Starbucks regularly sources coffee from farms engaging in human rights violations and destructive environmental behavior, despite those farms being part of Starbucks's and CI's C.A.F.E. Practices program.

203.    Defendant's unfair, false, misleading, and fraudulent practices in marketing the Products, as alleged herein, violate each of the following state consumer protection statutes to the extent that the Products have been marketed in, and purchased by Class members in, the respective state: Ala. Code § 8-19-5(27); Alaska Stat. § 45.50.471(a); Ariz. Rev. Stat. § 44-1522; Ark. Code § 4-88-107(a), (a)(10); Cal. Civ. Code § 1750, Cal. Bus. & Prof. Code §§ 17200, 17500, 17580.5; Colo. Rev. Stat. §§ 6-1-105 (e), (g); Conn. Gen. Stat.§ 42-110b(a); Del. Code Ann. tit. 6, § 2513(a); Fla. Stat. Ann. § 501.204; Ga. Code § 10-1-393(a); Haw. Rev. Stat. § 480-2(a), (d); Idaho Code § 48-603(17); 815 Ill. Comp. Stat. Ann. § 505/2; Ind. Code § 24-5-0.5-3(a); Iowa Code

§ 714H.3(1); Kan. Stat. § 50-626(a); Ky. Rev. Stat. § 367.170; La. Rev. Stat. Ann. § 51:1405(A); Me. Rev. Stat. Ann. tit. 5 § 207; Md. Code Comm. Law § 13-301(1), (3); § 13-303; Mass. Gen. Laws Ch. 93A, § 2(a); Mich. Comp. Laws Ann. § 445.903(1)(s), (bb), (cc); Minn. Stat. § 325F.69(1); Miss. Code § 75-24-5(2)(e),(g); Mo. Rev. Stat. § 407.020(1); Mont. Code § 30-14-103; Neb. Rev. Stat. § 59-1602; Nev. Rev. Stat. § 598.0915(15); N.H. Rev. Stat. § 358-A:2; N.J. Stat. Ann. § 56:8-2; N.M. Stat. Ann. §§ 57-12-2(D), 57-12-3; N.Y. Gen. Bus. Law §§ 349, 350; N.C. Gen. Stat. § 75-1.1(a); N.D. Century Code §§ 51-15-02, 51-15-02.3; Ohio Rev. Code § 1345.02; Okla. Stat. Ann. tit. 15, §§ 753, 752(13); Or. Rev. Stat. § 646.608(1); 73 Pa. Stat. § 201-2(4); R.I. Gen. Laws §§ 6-13.1-1(6)(xii), (xiii), (xiv), 6-13.1-2; S.C. Code § 39-5-20(a); S.D. Codified Laws § 37-24-6(1); Tenn. Code § 47-18-104(a); Tex. Bus. & Com. Code § 17.46(b)(2),(3),(5),(7),(24); Utah Code Ann. § 13-11-4(1); Vt. Stat. Ann. tit. 9, § 2453(a); Va. Code Ann. § 59.1-200(A)(14); Wash. Rev. Code § 19.86.020; W. Va. Code §§ 46A-6-102(7); Wis. Stat. Ann. § 100.18(1); Wyo. Stat. Ann. § 40-12-105(a)(xv).

204.     Defendant makes and has made the misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

205.     Plaintiff and the Class members have been injured by their purchase of the Products.

206.     As a direct and proximate result of Defendant's violation of consumer protection law, Plaintiff and all other Class members have suffered damages in an amount to be determined at trial.

207.     On April 25, 2025, a pre-suit letter was sent to Defendant via certified mail, which provided notice of Defendant's violations of state consumer protection statutes and demanded that Defendant correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. The letter also stated that if Defendant refused to do so, a complaint

seeking damages would be filed. Defendant received the letter on April 28, 2025 but has failed to take corrective action. Accordingly, Plaintiff, on behalf of himself and all other members of the Class, seeks compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendant's acts and practices, according to the availability of relief under the applicable statutes.

**COUNT VI**
**Violation of State Consumer Protection Statutes**
**(on Behalf of Plaintiff and the Decaf Subclass)**

208.    Plaintiff repeats and realleges all allegations contained in the foregoing paragraphs.

209.    Defendant has marketed its Decaf House Blend Medium Roast with its Safe and Effective Representations when, in fact, laboratory testing shows that Decaf House Blend Medium Roast contains chemicals that are potentially harmful to human health.

210.    Defendant's unfair, false, misleading, and fraudulent practices in marketing the Products, as alleged herein violate, each of the following state consumer protection statutes to the extent that the Products have been marketed in, and purchased by Class members in, the respective state: Ala. Code § 8-19-5(27); Alaska Stat. § 45.50.471(a); Ariz. Rev. Stat. § 44-1522; Ark. Code § 4-88-107(a), (a)(10); Cal. Civ. Code § 1750, Cal. Bus. & Prof. Code §§ 17200, 17500, 17580.5; Colo. Rev. Stat. §§ 6-1-105 (e), (g); Conn. Gen. Stat.§ 42-110b(a); Del. Code Ann. tit. 6, § 2513(a); Fla. Stat. Ann. § 501.204; Ga. Code § 10-1-393(a); Haw. Rev. Stat. § 480-2(a), (d); Idaho Code § 48-603(17); 815 Ill. Comp. Stat. Ann. § 505/2; Ind. Code § 24-5-0.5-3(a); Iowa Code § 714H.3(1); Kan. Stat. § 50-626(a); Ky. Rev. Stat. § 367.170; La. Rev. Stat. Ann. § 51:1405(A); Me. Rev. Stat. Ann. tit. 5 § 207; Md. Code Comm. Law § 13-301(1), (3); § 13-303; Mass. Gen. Laws Ch. 93A, § 2(a); Mich. Comp. Laws Ann. § 445.903(1)(s), (bb), (cc); Minn. Stat. § 325F.69(1); Miss. Code § 75-24-5(2)(e),(g); Mo. Rev. Stat. § 407.020(1); Mont. Code § 30-14-103; Neb. Rev. Stat. § 59-1602; Nev. Rev. Stat. § 598.0915(15); N.H. Rev. Stat. § 358-A:2; N.J. Stat. Ann. § 56:8-2; N.M. Stat. Ann. §§ 57-12-2(D), 57-12-3; N.Y. Gen. Bus. Law §§ 349, 350;

N.C. Gen. Stat. § 75-1.1(a); N.D. Century Code §§ 51-15-02, 51-15-02.3; Ohio Rev. Code § 1345.02; Okla. Stat. Ann. tit. 15, §§ 753, 752(13); Or. Rev. Stat. § 646.608(1); 73 Pa. Stat. § 201-2(4); R.I. Gen. Laws §§ 6-13.1-1(6)(xii), (xiii), (xiv), 6-13.1-2; S.C. Code § 39-5-20(a); S.D. Codified Laws § 37-24-6(1); Tenn. Code § 47-18-104(a); Tex. Bus. & Com. Code § 17.46(b)(2),(3),(5),(7),(24); Utah Code Ann. § 13-11-4(1); Vt. Stat. Ann. tit. 9, § 2453(a); Va. Code Ann. § 59.1-200(A)(14); Wash. Rev. Code § 19.86.020; W. Va. Code §§ 46A-6-102(7); Wis. Stat. Ann. § 100.18(1); Wyo. Stat. Ann. § 40-12-105(a)(xv).

211.     Defendant makes and has made the misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

212.     Plaintiff and the Decaf Subclass members have been injured by their purchase of the Decaf House Blend Medium Roast.

213.     As a direct and proximate result of Defendant's violation of consumer protection law, Plaintiff and the Decaf Subclass members have suffered damages in an amount to be determined at trial.

214.     On April 25, 2025, a pre-suit letter was sent to Defendant via certified mail, which provided notice of Defendant's violations of state consumer protection statutes and demanded that Defendant correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. The letter also stated that if Defendant refused to do so, a complaint seeking damages would be filed. Defendant received the letter on April 28, 2025 but has failed to take corrective action. Accordingly, Plaintiff, on behalf of himself and the Decaf Subclass, seeks compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendant's acts and practices, according to the availability of relief under the applicable statutes.

## COUNT VII
### Breach of Express Warranty of Merchantability
### (on Behalf of Plaintiff and the Class)

215.    Plaintiff repeats and realleges all allegations contained in the foregoing paragraphs.

216.    Defendant is and has marketed the Products with the Human Rights Representations and Sustainability Representations when, in fact, Starbucks regularly sources coffee from farms engaging in human rights violations and destructive environmental behavior, despite those farms being part of Starbucks's and CI's C.A.F.E. Practices program.

217.    Because the Products fail to conform to Defendant's express warranties, Defendant has breached the express warranty obligations under common law principles recognized in all states. As a result of this breach, consumers who relied on these representations when purchasing the Products have suffered harm, including economic injury from purchasing a product that does not meet the promised standards.

218.    Among other things, Plaintiff and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above. Moreover, had Plaintiff and the Class members known the true facts, they either would not have purchased the Products, would have purchased less of the Products, or would not have been willing to pay the premium price Defendant charged for the Products.

219.    Plaintiff, on behalf of himself and the Class, seeks compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

220.    On April 25, 2025, a pre-suit letter was sent to Defendant via certified mail, which provided notice of Defendant's violations of state consumer protection statutes and demanded that Defendant correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. The letter also stated that if Defendant refused to do so, a complaint

seeking damages would be filed. Defendant received the letter on April 28, 2025 but has failed to take corrective action. Accordingly, Plaintiff, on behalf of himself and all other members of the Class, seeks compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendant's acts and practices, according to the availability of relief under the applicable common law.

<u>COUNT VIII</u>
**Breach of Express Warranty of Merchantability**
**(on Behalf of Plaintiff and the Decaf Subclass)**

221.    Plaintiff repeats and realleges all allegations contained in the foregoing paragraphs.

222.    Starbucks has marketed its Decaf House Blend Medium Roast with its Safe and Effective Representations when, in fact, laboratory testing shows that Decaf House Blend Medium Roast contains chemicals that are potentially harmful to human health.

223.    Because the Decaf House Blend Medium Roast fails to conform to Defendant's express warranties, Defendant has breached its express warranty obligations under common law principles recognized in all states. As a result of this breach, consumers who relied on these representations when purchasing the Decaf House Blend Medium Roast have suffered harm, including economic injury from purchasing a product that does not meet the promised standards.

224.    Among other things, Plaintiff and members of the Decaf Subclass did not receive the benefit of the bargain and have suffered other injuries as detailed above. Moreover, had Plaintiff and the Decaf Subclass members known the true facts, they either would not have purchased the Decaf House Blend Medium Roast, would have purchased less of the Decaf House Blend Medium Roast, or would not have been willing to pay the premium price Defendant charged for the Decaf House Blend Medium Roast.

225.    Plaintiff, on behalf of himself and the Decaf Subclass, seeks compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

226.    On April 25, 2025, a pre-suit letter was sent to Defendant via certified mail, which provided notice of Defendant's violations of state consumer protection statutes and demanded that Defendant correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. The letter also stated that if Defendant refused to do so, a complaint seeking damages would be filed. Defendant received the letter on April 28, 2025 but has failed to take corrective action. Accordingly, Plaintiff, on behalf of himself and all other members of the Class, seeks compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendant's acts and practices, according to the availability of relief under the applicable common law.

## COUNT IX
## Unjust Enrichment
### (on Behalf of Plaintiff and the Class)

227.    Plaintiff repeats and realleges all allegations contained in the foregoing paragraphs.

228.    Defendant has been unjustly enriched at the expense of consumers by misrepresenting the Products with the Human Rights Representations and Sustainability Representations when, in fact, Starbucks regularly sources coffee from farms engaging in human rights violations and destructive environmental behavior, despite those farms being part of Starbucks's and CI's C.A.F.E. Practices program.

229.    It would be inequitable for Defendant to retain the benefits of its wrongful conduct without compensating the consumers who purchased the Products under false pretenses. Therefore, Plaintiff and the Class seek restitution and disgorgement of all ill-gotten gains that Defendant obtained through the deceptive marketing and sale of the Products.

230.    Plaintiff, on behalf of himself and the Class, seeks financial restitution, attorney's fees, costs, and any other just and proper relief available under law.

## COUNT X
### Unjust Enrichment
### (on Behalf of Plaintiff and the Decaf Subclass)

231.    Plaintiff repeats and realleges all allegations contained in the foregoing paragraphs.

232.    Defendant has been unjustly enriched at the expense of consumers by misrepresenting Starbucks Decaf House Blend Medium Roast with its Safe and Effective Representations when, in fact, laboratory testing shows that Decaf House Blend Medium Roast contains chemicals that are potentially harmful to human health.

233.    It would be inequitable for Defendant to retain the benefits of its wrongful conduct without compensating the consumers who purchased the Products under false pretenses. Therefore, Plaintiff and the Subclass seek restitution and disgorgement of all ill-gotten gains that Defendant obtained through its deceptive marketing and sale of the Products.

234.    Plaintiff, on behalf of himself and the Subclass, seeks financial restitution, attorney's fees, costs, and any other just and proper relief available under law.

## JURY TRIAL DEMANDED

235.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for judgment on behalf of himself and the proposed Class (including all      Subclasses) against Defendant and requests that the Court provide such relief as follows:

A.    Certification of the Class proposed herein under Federal Rule of Civil Procedure 23; appointment of Plaintiff as representative of the Class and appointment of his undersigned counsel as counsel for the Class;

B.    A declaration that Defendant is financially responsible for notifying members of the Class of the pendency of this suit;

51

C. An order requiring an accounting for, and imposition of, a constructive trust upon all monies received by Defendant as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein;

D. Restitution, disgorgement, refund, and/or other monetary damages, including treble damages, together with costs and disbursements, including reasonable attorneys' fees and expert fees, and prejudgment interest at the maximum rate allowable by law;

E. Statutory or actual damages pursuant to New York General Business Law Sections 349 and 350, and treble damages pursuant to Section 349;

F. Punitive damages in accordance with proof and in an amount consistent with applicable precedent; and

G. Such other and further relief as the Court may deem just and proper.

Dated: May 7, 2025                                         Respectfully submitted,

Kim E. Richman
**RICHMAN LAW & POLICY**
1 Bridge Street, Suite 83
Irvington, New York 10533
Telephone: (914) 693-2018
krichman@richmanlawpolicy.com

*Attorney for Plaintiff and the Putative Class*